# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| PPS SERVICE GROUP, LLC, | Case No. 1:18-cv-727 |
| Plaintiff, | Barrett J. |
| v. | Bowman, M.J. |
| ADAM ECKERT, et al., | |
| Defendants. | |

## REPORT AND RECOMMENDATION

This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1831 et seq., and the Ohio Uniform Trade Secrets Act (OUTSA), R.C. 1333.61, et seq., along with additional common-law claims. Plaintiffs seek a preliminary injunction prohibiting Defendants from benefitting from the use of PPS' confidential and proprietary materials – materials that Plaintiff alleges Defendants misappropriated while working for PPS but secretly running a competitive business – pending the resolution of this matter. Based on the allegations contained in the Verified Complaint, Defendant Roby agreed to the issuance of a preliminary injunction.[1] (Doc. 9). However, after conducting brief discovery, Roby now believes that the principal allegations in Plaintiff's complaint that supported entry of a Preliminary Injunction are demonstrably not true. As such, Roby seeks to dissolve the agreed upon preliminary injunction. (See Doc. 24).

---

[1] Defendant Eckert did not agree to the entry of the Preliminary Injunction. Additionally, Mr. Eckert has not answered or otherwise pled in this action. As such, the Clerk entered default against Eckert on June 4, 2019. Plaintiff then filed a motion for default judgment that same day. The motion for default judgment remains pending. (See Doc. 68).

1

The undersigned held a comprehensive three-day hearing on the motion for a preliminary injunction on March 21, March 27, and April 19, 2019.

I.   *Background and Facts*

In late 2016, Adam Eckert shared a business opportunity with a longtime friend and former kindergarten pal, Matt Johnson. (See Johnson Depo[2]., Ex. 1 at 60-61). At the time, Mr. Eckert "had vast knowledge, obviously, of the industry (with) many years of experience" and knowledge of "RFPs and clients (that) were going to become available." Id. Mr. Johnson saw that Mr. Eckert's knowledge presented "an opportunity to start (a) business with (Mr. Eckert) at the forefront." *Id.*

Thereafter, Mr. Johnson formed PPS Service Group ("PPS") to take advantage of Mr. Eckert's knowledge, experience, and opportunities. (Id. at 8-10, 13, 60-61; see also, Exh. 2). PPS provides nationwide landscaping, snow and ice removal, parking lot maintenance, and customized facility management services.  Mr. Johnson became PPS' President and Owner, but he remained employed by ProPharma Sales (a separate entity he owns). (Id. at 6-12) PPS then used Mr. Eckert's pre-existing knowledge and contacts to secure snow removal, ice removal, and landscape contracts from retailers, which PPS then sought out third parties to perform the actual work. (Id. at 9). According to Mr. Johnson, PPS' sales were the product of Mr. Eckert's "previous relationships with people within the industry." (Id. at 17).

In September 2017, PPS hired another industry veteran, Robert Roby. (Id. at 16). Like Mr. Eckert, Mr. Roby had decades of experience and numerous contacts. (Id. at 63). He had been an executive leader driving procurement departments for 13 years.

---

[2] Plaintiff's counsel has not indicated what portion, if any, of Mr. Johnson's or Eckert's testimony they deem "Confidential." Once that issue is resolved, Mr. Roby will file the depositions consistent with that outcome.

(See Doc. 23, Ex. 3). He formerly worked with national leaders in the industry, Brickman and CaseSnow Management and had experience and contacts throughout the United States. Id. PPS required Mr. Roby to sign an Employment Offer and a Non-Disclosure Agreement ("NDA"). (See Doc. 23 Exhs. 4 and 5).

In January of 2018, Mr. Roby testified that he was offered a job by Kris Tull, the head of procurement at FacilitySource. Roby testified that Tull wanted to hire him to find vendors for thousands of sites. However, the position was located in Arizona. Roby did not want to move his family from Ohio, so he declined the offer. (Doc. 55 at 6). Tull then suggested that Roby start his own company and do the same work as an independent contractor. Thereafter Roby formed his own company REMS Nationwide Procurement, LLC ("REMS").

Roby testified that REMS did not perform any services. Instead, REMS brokered the deal from the contractor for the client. (Doc. 64 at 39). REMS was created to be the procurement "middleman" between a company like PPS and those who clear parking lots. (See Doc. 24, Exh. 3). PPS was created to be a "middleman" between retailers and service providers who would clear parking lots. (See Doc. 24, Ex. 3, Roby Aff.). In this regard, REMS would perform the task of procuring laborers for contracts already secured between a PPS (or by its competitors like Cherry Logistics, Merit, Dentco, etc.) and a retailer. *Id.* PPS would service the contract. (Doc. 64, at 93).

PPS' customers and prospects are retailers. Id. Meanwhile, REMS' customers and prospects are PPS and its competitors. Id. Additionally, the pricing models used by PPS and REMS have nothing in common. Id. REMS charges a nominal flat rate per parking lot (i.e., $90). Id. The roles of REM and PPS is illustrated below:

3



Beginning in January 2018, and continuing through their termination from PPS in September 2018, PPS contends that Defendants secretly conducted business on behalf of and solicited customers for REMS. In this regard, Plaintiff contends that Defendants often used their PPS email accounts to communicate with each other, their partners at REMS, and potential clients.

Notably on January 5, 2018, Roby emailed another REMS owner[3] a list of store locations for a PPS client. (Verified Complaint ¶20.).

On January 18, 2018, Roby sent an email to a potential PPS client. This client had contacted PPS about having PPS enter into a contract to provide snow removal services at up to 16,000 locations nationwide. Instead of working to get the client for PPS, Plaintiff contends that Defendant Roby signed his email as the "President" of REMS. He said, "REMS will be happy to help you…" and provided a series of PowerPoint slides describing REMS. (Verified Complaint ¶23.)

---

[3] Roby testified that he was the only owner of REMS and that even though materials were produced that showed Defendant Eckert as an officer/owner, that was not the case. See Pl. Ex. 3 (preliminary injunction hearing).

In a January 24, 2018 email, Eckert discussed with other REMS owners the development of a "pricing model" for REMS to present to clients. In developing this pricing model, Plaintiff claims that Eckert used proprietary pricing data from PPS, and even refers to a PPS customer. He adds at the end of the email: "I know this might get a little messy but it protects us and our proprietary data." (Verified Complaint ¶31.)

In March 2018, Plaintiff contends that Roby used his PPS email account to communicate with a potential client. Plaintiff contends other emails showed that Roby used his PPS email account and contacts to obtain pricing information in order to present a bid to this client. (Verified Complaint ¶33.) Again, in May and July 2018, Plaintiff alleges that when Roby used his PPS email to send to REMS, a PPS confidential and proprietary spreadsheet containing pricing and vendor information for customer services in order to prepare a bid on behalf of REMS for another client. (Verified Complaint ¶35-36.)

PPS contends that it discovered the alleged misconduct by Defendants in late August 2018. Plaintiff alleges that an investigation revealed that Defendants had been misappropriating PPS confidential and proprietary information since January 2018.

Additionally, according to Mr. Johnson, "as a practical matter (PPS had) only two clients," Aaron's and Kindercare (Doc. 24, Exh. 1 at 38; doc. 63 at 4). "Approximately $1.2 million," came from one customer, and the balance ($400,000) of PPS' total revenues came from PPS' only other customer. (Id. at 25-26, 31). Notably, on Sept. 10, 2018, PPS' largest customer, Aaron's, shared that it had decided to end its national contract with PPS. (Id. at 26; see also, Exh. 7: "executive leadership has decided to manage snow removal locally through the general manager and regional managers

5

versus using a national provider."). A few hours later, PPS terminated Mr. Eckert and Mr. Roby. (Id. at 94). PPS terminated the balance of its workforce (except a handyman) a few weeks after that. (Id. at 20- 23). For all practical purposes, PPS is no longer in business. *Id.*

This litigation followed. (Verified Complaint ¶¶38-39.) Plaintiff has brought claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1831 et seq., and the Ohio Uniform Trade Secrets Act (OUTSA). Plaintiff has also brought claims for breach of a non-disclosure agreement and breach of fiduciary duty by Defendants.

## II. Analysis

*A. Standard of review*

The purpose of a preliminary injunction is to preserve the status quo. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

**B. Likelihood of Success on the Merits**

As noted above, Plaintiff has brought claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1831 et seq., and the

Ohio Uniform Trade Secrets Act (OUTSA). Plaintiff has also brought claims for breach of a non-disclosure agreement and breach of fiduciary duty by Defendants.

   *1. DTSA and OUTSA*

In order to properly state a DTSA claim for injunctive relief, Plaintiff is required to show: (1) the existence of a protectable trade secret; and (2) misappropriation of the trade secret by defendant. *See e.g. Phyllis Schlafly Revocable Tr. v. Cori*, 2016 U.S. Dist. LEXIS 155409at *2 (E.D. Mo. Nov. 9, 2016) (setting forth elements of DTSA claim); *Ukrainian Future Credit Union v. Seikaly*, E.D.Mich. No. 17-cv-11483, 2017 U.S. Dist. LEXIS 194165, at *20 (Nov. 27, 2017) (same).

Similarly, to prevail on an OUTSA claim, a plaintiff must show "by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008). *See also Murray Energy Holdings Co. v. Mergermarket USA, Inc.*, S.D. Ohio No. 2:15-CV-2844, 2016 U.S. Dist. LEXIS 79183, at *7 (June 17, 2016) (quoting *Heartland Home Fin*. For elements of OUTSA claim).

Information can be characterized as a "trade secret" only when it "derives independent economic value…from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from" it. (See, 18 U.S.C. § 1839(3) and O.R.C. 1333.61(D). This case involves two types of alleged trade secrets: (i) customer lists; and (ii) proprietary pricing information.

The Ohio Supreme Court established a six factor test to determine whether something warrants trade secret protection: (1) the extent to which the information is

7

known outside the business; (2) the extent to which it is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. (*See State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535 (2000), *quoting State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-525 (1997).

Here, applying the factors outlined above, Plaintiff has failed to show that its customer list or pricing information constitute trade secrets. Notably, the hearing testimony establishes that there was no such customer list or pricing information. Such information, was based on Defendants' experience and knowledge of the industry. For example, before joining PPS, Defendants worked in the industry for years. (Doc. 23, Exh. 3). During that time, Defendants' employers solicited and/or did work for PPS customers and potential customers. *Id.* Accordingly, to the extent PPS' claim is based on a theory that Defendants misappropriated a PPS customer list, no evidence supports such a claim. To the contrary, the evidence clearly establishes that Defendants acquired knowledge of those entities long before PPS was formed. (Doc. 64). It is undisputed that each individual Defendant was hired by PPS because of his extensive knowledge of the industry, including prospective customers and pricing models. (Doc. 63, pp. 65-66; Doc. 23, Ex. 3). Roby testified that he brought a list of subcontractors that he had worked with during his 15 years in the procurement industry. (Doc. 64 at 108). The evidence also shows that PPS priced its service based on the square

footage of a lot and companies like PPS use free, accurate resources like Google Earth to create/build their responses to an RFP. (Doc. 64, pp. 105-109). Roby testified that the same pricing model is used across the country by other facility maintenance companies. (*Id.* at 108). Furthermore, the NDA that Mr. Roby signed explicitly stated that information he possessed prior to joining PPS was excluded from the globe of "Confidential Information." (See Doc. 24 Exh. 5).

Plaintiff argues that Defendants misappropriated PPS' trade secrets on a number of occasions purportedly based upon emails Roby sent to his REMS Email account, or to others who worked at REMS which allegedly included confidential customer contacts and proprietary pricing information. Plaintiff's contention lacks merit. Notably, at the hearing, Roby testified that that he did not like to take his work laptop and work phone home with him. As such, he would forward emails from his PPS account to his private email account in order to have access to them at home if a business question arose. (Doc. 64, pp. 66-67).

In light of the foregoing, the undersigned finds that PPS has failed to establish a likelihood of success on the merits on its claims for trade secret misappropriation.

### 2. Breach of Fiduciary Duty

PPS claims Defendants violated their fiduciary duty based on the common law duty of loyalty. Under Ohio law, directors and officers of a corporation have a duty of loyalty to the corporation. *Prodan v. Hemeyer*, 80 Ohio App. 3d 735, 740 (8th Dist. 1992), citing *Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App. 3d 178 (10th Dist. 1988). That duty prevents directors and officers from pursuing for their own benefit business opportunities that rightfully belong to their employers. *Miller Bros. Excavating*

*v. Stone Excavating*, 2d Dist. Greene C.A. Case No. 97-CA-69, 1998 Ohio App. LEXIS 104, at *14 (Jan. 16, 1998); *Hubbard v. Pape*, 2 Ohio App. 2d 326, 329 (1st Dist. 1964). See also *Joseph v. Joseph*, S.D. Ohio No. 1:16-cv-465, 2018 U.S. Dist. LEXIS 8854, at *21 (Jan. 19, 2018) ("Under Ohio law, a corporate director or officer may not misappropriate opportunities it discovered while acting for the corporation."), citing *Prodan*, supra. PPS contends that Defendants, while working as officers for PPS, pursued business opportunities for their own benefit. Plaintiff's claims lack merit.

As outlined above, there is no evidence that Defendants misused PPS "Confidential Information" to commit "acts in direct competition" with PPS." (See, Doc. 1 at 59). There is also no evidence that Mr. Roby used "his position at PPS to solicit PPS customers to hire a competitor (i.e., REMS)." (See, Id. at 61). Accordingly, Plaintiff has failed to establish a substantial likelihood of success on its claims for breach of fiduciary duty.

*3. Breach of Non-Disclosure Agreement*

As noted above, Defendants executed non-disclosure agreements limiting their ability to disclose or use the confidential and proprietary information of PPS. (Verified Complaint ¶¶13(c), 14(c) and Exhibits B and D.) This Agreement provides that Defendants would receive "confidential information: relating to PPS "business programs, products… and business topics." The nondisclosure agreements prohibited Defendants from reproducing the confidential information or communicating the information to other parties. Specifically, by signing the non-disclosure agreement Defendants agreed to "not use or utilize the Confidential Information without the express written consent" of PPS.

As detailed above, however, there is no evidence that Defendants used or disclosed any information that fits within the limited definition of "Confidential Information" that is contained in the NDA that PPS authored.[4]  Accordingly, Plaintiff has failed to establish a substantial likelihood of success on this claim.

**C. Irreparable harm**

Ohio courts have suggested that irreparable harm is generally presumed when the defendant is found to have misappropriated trade secrets. *See Columbus Steel Castings Co. v. King Tool Co.*, 2011-Ohio-6826, ¶ 71 (10th Dist.), citing *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC* (S.D. Ohio 2008), 630 F.Supp.2d 853, 867 (S.D. Ohio 2008) (the loss of trade secrets is usually considered an irreparable harm that cannot be measured in money damages). *See also Allure Jewelers, Inc. v. Ulu*, S.D. Ohio No. 12-91, 2012 U.S. Dist. LEXIS 13361, at *4 (Feb. 3, 2012) (noting that "the loss of trade secrets is usually considered an irreparable harm that cannot be measured in money damages").

Furthermore, under Ohio law, irreparable harm exists when there is a substantial threat of material harm that cannot be adequately compensated through monetary damages. *Prosonic Corp. v. Stafford*, 539 F.Supp.2d 999, 1007 (S.D. Ohio 2008), citing *Fraternal Order of Police v. Cleveland*, 141 Ohio App. 3d 63 (2001).

Here, however, as noted above, Plaintiff has not established that Defendants misappropriated any trade secrets. As such, there is no irreparable harm to PPS.[5]

---

[4] Interestingly, there is not a non-compete agreement between the parties.

[5] The Court also notes that PPS is no longer in business and thus cannot suffer any harm.

11

### D. Harm to Others and Public Interest

With regard to determining the probability that granting a temporary restraining order will substantially harm others, "the focus is on the harm that a defendant will suffer[.]" *Lander v. Montgomery Cty. Bd. Comm'r*, 159 F. Supp. 2d 1044, 1053 n. 18 (S.D. Ohio 2001). Additionally, the public interest is served by having reasonable non-disclosure agreements enforced and preventing unfair competition. *See ALTA Analytics, Inc. v. Muuss*, 75 F.Supp.2d 773, 786 (S.D.Ohio 1999) ("the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts.") (quoting *National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 891 (N.D.Ohio 1996)). However, it also is served by ensuring that an individual's employment opportunities are not unduly restrained. Here, there is no evidence that Defendants misappropriated any trade secrets or breached any duties owed to PPS and thus no harm.

In sum, balancing the equities in this case, the Court concludes that a preliminary injunction is not well-taken and should not be granted. Additionally, the undersigned also finds that Defendant Roby's motion to dissolve the preliminary injunction should be granted.

### III. Conclusion

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant Roby's motion to dissolve preliminary injunction (Doc. 24) be **GRANTED**; and Plaintiff's motion for a preliminary injunction (Doc. 2) be **DENIED**.

   *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| PPS SERVICE GROUP, LLC, | Case No. 1:18-cv-727 |
| Plaintiff, | Barrett J. |
| | Bowman, M.J. |
| v. | |
| ADAM ECKERT, et al., | |
| Defendants. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).